Per Curiam::
Plaintiff, a captain in the United States Army Reserve, was called to active duty on July 1, 1953, released on October 4,1954, by reason of physical disability found to have existed prior to service, and on October. 13, 1955, placed on the retired list, without pay. He applied for correction of his records to show retirement by reason of service incurred or aggravated physical disability on October 4, 1954, due to active pulmonary tuberculosis and hearing impairment, with a combined disability rating of 100 percent, and contends that denial of this application by the Assistant Secretary of the Army on June 24, 1957, in *262 approving findings, conclusions and recommendations of the Army Board for Correction of Military Becords was illegal, arbitrary and capricious. Pie now seeks judgment against defendant for loss of disability retirement pay from October 4,1954, to date of judgment.
A report of his findings of fact in this case was made by Trial Commissioner Wilson Cowen on October 29, 1963. Plaintiff filed a statement submitting the case on the commissioner’s report without a brief and on January 2, 1964, defendant filed an “admission of liability” as to the claim for increased hearing loss by reason of service aggravation with a statement that as to the claim based upon alleged reactivation or aggravation of plaintiff’s tubercular condition defendant accepts the commissioner’s findings Nos. 30 through 33. Upon consideration of the pleadings filed and the findings of fact of the trial commissioner, the court approves the findings and concludes as a matter of law that plaintiff is entitled to recover disability retirement pay on his claim for increased hearing loss and as to this claim judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Eule 38(c). Plaintiff is not entitled to recover on his claim relating to his tubercular condition and as to this claim his petition is dismissed.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the pleadings and papers filed by the parties, makes findings of fact as follows:
L Bert C. Wiley, the plaintiff, a physician, was commissioned as a captain, Medical Corps, United States Army Eeserve, on April 27, 1953, and was called to active duty on July 1, 1953. On October 4, 1954, he was released from active duty by reason of physical disability which the Army authorities found had existed prior to service. He sues for disability retirement pay from October 4,1954, on the ground that at the time of his release from active duty he was physically unfit for active service by reason of service incurred or aggravated physical disabilities, i.e., pulmonary tuberculosis and defective hearing, and that the denial of his claim for retirement pay and for the correction of his *263 military records to reflect such entitlement, were arbitrary and capricious actions.
2. Plaintiff was bom on March 7, 1908. His medical history prior to his induction in July 1953, included: a left mastoidectomy, brain abscess (temporal lobe) and left external jugular vein thrombosis in 1918; some loss of hearing following the mastoidectomy; a heat stroke, influenza, tonsillectomy and adenoidectomy in 1919; pulmonary tuberculosis beginning in 1932; appendectomy in 1936; poliomyelitis and bilateral peroneal muscle paralysis with some atrophy in 1944; bilateral high saphenous vein ligation and multiple lower ligations for varicose veins in 1946; temporary liver enlargement in 1946.
3. As noted above, plaintiff had advanced pulmonary tuberculosis in 1932, was kept in his home under strict bed rest for about three years, and was given artificial pneumo-thorax for 17 months. By 1943, when he received an M.D. degree from Ohio State University, his tuberculosis was arrested. In 1942 he was rejected by his draft board because of his history of tuberculosis. From September 1950 to June 1952, he was director of the Department of Physical Medicine at Acuff Clinic at Knoxville, Tennessee. He left the clinic in 1952 and started work at the Conemaugh Hospital in Johnstown, Pennsylvania, in the Physical Medicine Department. He was working full time as director of the Physical Medicine Department when he entered on active duty on July 1, 1953. In his practice of medicine in the Conemaugh Valley Hospital, he worked a 40-hour week, lived in a quiet home, allotted his time, and controlled the number of patients he treated and his workload.
4. Selective Service records reflect that plaintiff was initially classified during World War II in Class II-A as a medical student. In January 1942, plaintiff was placed in Class IV-E (conscientious objector). In October 1942 plaintiff was reclassified IV-F as the result of a physical examination which revealed his defective hearing, a history of tuberculosis, and an incomplete right inguinal hernia. The examining physician noted plaintiff’s use of a hearing aid. Selective Service records contained an audiogram dated April 16, 1941, which showed a hearing loss ranging from *264 30 to 50 decibels in the left ear and from 0 to 10 decibels in the right ear. On October 30,1945, plaintiff was reclassified IV-A, as overage for military service.
5. Following the enactment of the Doctors Draft Act on September 9,1950 (64 Stat. 826), which made eligible for the draft certain doctors not over 50 years of age, plaintiff was given a preinduction physical examination on September 17, 1952, and was found not physically qualified for service. Some of the disqualifying defects noted were: pulmonary tuberculosis, moderately advanced, arrested; perforated left [ear] drum, dry; left mastoid scar; visual defect; and hearing defect.
fi. By a Department of the Army memorandum dated January 12, 1953, the physical standards for special registrants under the Doctors Draft Act were lowered in order to utilize more of the doctors and dentists who could reasonably be expected to be productive. This memorandum stated in part:
3. Conditions such as those listed below which have ■been previously considered as a cause for rejection may now be considered as acceptable for appropriate assignment consideration.
(1) Tuberculosis if stable for 2 years and no previous complication such as thoracoplasty * * *
(45) Auditory acuity, unless bilateral hearing loss with hearing aid more than 20 decibels at 500,1000, and 2000 CPS. Unilateral hearing loss not disqualifying.
7. The memorandum of January 12, 1953, was modified as follows by a Surgeon General’s letter of March 23,1953:
3. g. “(45) Auditory acuity, unless bilateral hearing loss with hearing aid more than 20 decibels rat 500,1000, and 2000 OPS. Unilateral hearing loss not disqualifying.” This paragraph should read “Auditory acuity, unless hearing loss in the better ear averages more than 50 decibels at 500,1000, and 2000 CPS. Complete unilateral hearing loss is not disqualifying.” Individuals with a hearing loss up to the range of 50 to 60 decibels, ■in most instances, can be benefited by the use of a hearing aid. If the individual does not have or does not elect to wear a hearing aid, he can still be considered qualified for military service providing he has a particular usefulness and the defect will not interfere with a satis *265 factory performance of the practice of dentistry, medicine, or veterinary medicine in the military service.
As a result of the foregoing memorandum, the report of plaintiff’s preinduction physical examination of September 17, 1952, was reviewed at Headquarters, Second Army, on January 23,1953, and plaintiff was found qualified for military service “with waiver granted for history of tuberculosis, arrested.”
8. On April 14, 1953, plaintiff received a hearing test at the Armed Forces Examination Station in Pittsburgh, Pennsylvania. The results were recorded as an A.M.A. percentage of hearing loss at 60 percent in the left ear, 70.1 percent in the right ear, and 60.1 percent combined.
Shortly after the hearing test, plaintiff applied for a commission because he preferred to go in the Army as an officer rather than a draftee. He was offered a commission as captain in the Medical Corps, U.S.A.E., which he accepted on April 27,1953.
9. On July 1,1953, plaintiff reported for active duty with the Medical Field Service School at Fort Sam Houston, Texas, where he received the same one-month course of instruction as the other officers attending the school. This training included a course in weapons familiarization, field exercise instructions in the organization of the medical battalion, and map reading.
10. When plaintiff left his Johnstown, Pennsylvania, home on June 29,1953, the usual mid-day temperature was between 30 and 50 degrees; whereas during July 1953 at Fort Sam Houston, Texas, it was 96 degrees inside his barracks at 5:00 a.m., 103 degrees in the shade during the day, and 108 degrees in the sun on the drill field. Plaintiff seldom slept more than 4-6 hours a night as the lights generally were not out before 11 p.m., and he usually arose at 5:00 a.m. or earlier.
11. On July 5, 1953, plaintiff had duty as “charge of quarters” and stayed awake late into the evening. The following day he was ordered to the post dispensary to have eye glasses prescribed for overseas duty. At the dispensary he mentioned his fatigability, said that he had been told that there were changes in the preinduction X-ray film of his chest and requested a chest consultation.
*266 12. On July 10, 1953, the dispensary recommended that plaintiff have a consultation with doctors in the chest clinic at Brooke Army Hospital. His chest was X-rayed on July 13, 1953, and he was given a note from the chest clinic, which read:
It is requested that Captain Bert Wiley be excused from all strenuous exercises — such as hiking, calisthenics, etc. for a period of at least two weeks, * * *.
13. Activity of the lesions shown by the July 13,1953, X-ray could not be determined from one examination, and plaintiff was directed to return to the chest clinic after the return to the post of Colonel Vivas, the Assistant Chief of Medical Service, Brooke Army Hospital. Subsequently, plaintiff showed the note from the chest clinic to his superior officer, who disregarded its contents and ordered plaintiff to drill. On July 16, 1953, plaintiff walked about 5y2 miles in completion of a map-reading problem.
14. On August 1, 1953, plaintiff completed the course of instruction at the Medical Field Service School and entered Brooke Army Hospital for observation to determine whether his arrested pumonary tuberculosis had become active since his entry on active duty on July 1, 1953. This action was taken at the suggestion of the chief of the contagious section of Brooke Army Hospital, who felt there had been some X-ray changes in plaintiff’s lung fields which might indicate active tuberculosis at that time.
15. Upon admission to Brooke Army Hospital on August 1, 1953, plaintiff was given bed rest until sputum and gastric cultures could 'be obtained. His wife arrived in San Antonio on August 3, 1953. On August 4, 1953, plaintiff was transferred to a positive tuberculosis ward. On September 19, 1953, chemotherapy consisting of ditubin (also called INH or Isoniozid) 300 mg. daily, and dihydrostreptomycin, 1 gram twice a week, was begun. Beginning January 1,1954, plaintiff was given streptomycin instead of dihydrostrepto-mycin.
16. On January 15,1954, plaintiff’s X-rays were reviewed by the military consultant and the civilian consultant in chest diseases, as well as by members of the hospital staff. The consensus was that there was no change in the 'lesions *267 during the preceding few months, but that there had been a slight change for the better since 1952. On this basis plaintiff was placed on convalescent leave for 90 days, beginning January 29, 1954. On this date chemotherapy ceased. Plaintiff returned to the hospital on April 29,1954, for a physical examination and was again placed on 90 days’ leave, beginning May 5,1954.
17. On June 9,1954, plaintiff’s entire series of chest X-rays dating back several years was reviewed by the entire staff and it was concluded that “* * * there is no roentgen evidence of any significant change whatsoever in any of the pulmonary lesions during the past five or six years.” On August 3, 1954, plaintiff returned to the hospital and was given a complete medical examination.
18. On August 6,1954, plaintiff appeared before a Medical Board and it was recommended that he return to duty after the expiration of 14 days’ leave.
19. On August 10, 1954, the Ward Officer in charge of plaintiff’s treatment at Brooke Army Hospital, made the following notation in plaintiff’s clinical record:
* * * When he was originally admitted to the hospital, the lesion was thought unstable because it was felt that some clearing had occurred. After a careful review, however, this was attributed to X-ray technique only. For this reason, he was placed on a convalescent leave to increase his activities. The patient places great store in the sedimentation rate as an index of whether his pulmonary tuberculosis is active or inactive, and this has been a considerable argumentive [sic] point on his part. It has been the feeling of the Chest Service that there are too many factors wmch can cause sed rate elevation, and it cannot reliably be used. The sed rate is known to be normal in patients who have active disease in many cases, as well as elevated in patients whose disease is inactive. For this reason, it has been disregarded in this case. * * *
20. On September 7,1954, plaintiff appeared before a third Medical Board. The Board reported the following diagnoses:
1. Tuberculosis, pulmonary, inactive (at least 23 months), moderately advanced, bilateral, treated, unchanged. LD: No, EPTS. 2. Deafness, conductive, left ear, secondary to repeated ear infections and mas- *268 toideotomy, untreated, unchanged., 'hearing as on audio-gram. LD: No, EPTS. 3. Deafness due to degeneration of acoustic nerve, due to unknown cause, right ear. LD: No, EPTS. 4. Deafness, n.e.e., bilateral, due to aeoustie toxicity from dihydrostreptomycin amd streptomycin, hearing as on audiogram, untreated, worse. LD : Yes. [Emphasis added.]
The Medical Board, in general, found plaintiff to have inactive pulmonary tuberculosis and partial deafness and recommended his appearance before a Physical Evaluation Board. The Board further stated:
* * * Patient is permanently unfit for further military service and tibe degree of disability can be established at this time. He has received maximum hospital benefits and transfer to a Veterans Administration facility is not required. Patient is not properly motivated for further active duty.
21. A Physical Evaluation Board convened September 8, 1954, agreed with the diagnoses of the September 7 Medical Board with one exception, that is, the finding that plaintiff’s bilateral deafness was due to acoustic toxicity from dihydrostreptomycin and streptomycin and was incurred in line of duty. As to this, the Physical Evaluation Board stated:
* * * Paragraph 2c (2), AR 600-140, states that medical or.surgical treatment furnished during service for preexisting conditions does not of itself establish service-aggravation; for this reason, the Physical Evaluation Board feels that Diagnosis (4) would also come under the EPTS provision.
The Board further stated:
For the purpose of rating, the Physical Evaluation Board rates Diagnosis (1) as inactive moderately advanced, under veterans Administration Code 6722. Diagnoses (2), (8) 'and (4) were combined for rating purposes, and, according to audiometer and speech reception tests, three series each, which were given on 12 and 18 August, 1954 and 1 September 1954 * * * he has 76 decibel loss for the right ear and 83 decibel loss for the left ear under Veterans Administration Code 6261. This officer in his sworn statement said that, if he could see a person’s lips, he did not have difficulty in ascertaining what the person was saying *269 or did not have difficulty in maintaining conversation. No medical witnesses were called.
22. On September 8, 1954, plaintiff returned from leave ■and continued as a bed patient in Brooke Army Hospital. On September 13, 1954, be filed a rebuttal to the findings of the Physical Evaluation Board. On September 15,1954, the recommendations of the Physical Evaluation Board were forwarded to the Secretary of the Army, and on September 17,1954, the Army Physical Review Council reviewed the proceedings and approved the findings of the Physical Evaluation Board. On September 27, 1954, the Secretary of the Army approved the disposition of the Review Council and ordered that plaintiff be released from active duty.
Plaintiff was relieved from active duty effective October 4, 1954, for physical disability without entitlement to disability severance pay because of the determination that his disability had not been incurred in line of duty. He was transferred to the Retired Reserve on October 13,1954.
23. Approximately a month after release to inactive duty plaintiff applied to the Veterans Administration for disability compensation based upon alleged service-connected tuberculosis and deafness. The Veterans Administration conducted a special chest examination, with X-ray, on November 8, 1954, which resulted in a diagnosis that plaintiff’s pulmonary tuberculosis was moderately advanced but arrested and was not incurred or aggravated by his military service. After two audiometric examinations, the Veterans Administration on March 8, 1955, decided that there was no service connection or service aggravation for arrested tuberculosis or defective hearing. The rating sheet issued by the Veterans Administration contained the following:
Review of service records shows that veteran had a left madtoidectomy [sic] and brain abscess, temporal lobe, and a left external jugular vein thrombosis in 1918. Following the left mastoidectomy, he had a gradual loss of hearing, involving both ears, more on the left. He entered school for medical training in 1938 and wore a hearing aid and took special training in lip reading in order to enable him to continue in medical school. He was rejected by the draft board in 1942 because of healed tuberculosis and defective hearing. While in *270 service there was for some time a question as to whether his pulmonary tuberculosis had become reactivated and he received a [sic] dihydrostreptomycin in a dosage of gms. one twice weekly for a total of 32 gms. over a period of 15-16 weeks. He then received a minimal dosage of streptomycin, that is one gram twice weekly for four weeks. There was never any trauma to his auditory apparatus or reactivation of auditory infection during service.
In the dosage in which streptomycin and its allied compound were exhibited in this case there has never been any auditory damage incurred. Service connection, therefore, for defective hearing, either by way of incurrence or aggravation is not in order.
* t- * * *
The determination was affirmed on March 13,1957, by the decision of the Board of Veterans Appeals.
24. On December 9,1954, plaintiff filed an application with the Army Disability Review Board for a review of the decision of the Army Physical Review Council. On March 29, 1955, the Board affirmed the previous administrative findings and additionally determined that the approximate data of origin or inception of plaintiff’s bilateral deafness, due to acoustic toxicity from dihydrostreptomycin and streptomycin, was October 1953. The Board reported its conclusions as follows:
1. That the symptoms complained of and the physical findings recorded during active service are recurring episodes of a preexisting disease, are not beyond the natural progress thereof, and do not constitute permanent aggravation.
2. The member’s physical unfitness is produced by a condition which existed prior to military service and not permanently aggravated by military service, namely: “Tuberculosis, pulmonary, etc.” (supra). The additional disabilities contained in diagnoses (2), (3) and (4) “Deafness, etc.” (supra) do not of themselves render the member physically unfit for military service; therefore the member is not entitled to benefits under Public Law 351, 81st Congress. (JAGrA 1952/8204)
25. On November 30, 1955, plaintiff filed an application for correction of his military records. At the request of the Army Board for the Correction of Military Records, the *271 Surgeon General’s Office reviewed plaintiff’s records and on August 30, 1956, made a report which concluded as follows: *****
2. Based upon the evidence of record, the opinion is expressed that there is no evidence to indicate that this individual suffered activation of his EPTS pulmonary tuberculosis while in the service.
3. The records indicate that on entry into the service this officer had a hearing defect which was rateable by the Yeterans Administration Schedule at 10 %. On separation from the service his auditory perception was markedly diminished compared with that on entry into the service. The hearing defect on separation from the service is considered to warrant a gross rating of 80%.
4. The reports on auditory acuity of this individual are not consistent and in instances appear to be conflicting. How much of the unfavorable progress was due to the nature of the condition and how much was due to other causes can not be stated. It does appear probable that his hearing was adversely affected by the streptomycin administered to him during service.
5. Based on the evidence of record, the opinion is expressed that at the time this officer was separated from the service his auditory 'acuity was such as to render him unfit for duty, and that a rating under the Veterans Administration Schedule of 70% (10% of EPTS and 80% on separation=70% service aggravated) is commensurate with the degree of disability and compatible with the Veterans Administration Schedule for Eating Physical Disability.
26. (a) On November 14,1956, the Correction Board heard plaintiff’s application and adjourned pending recall for further consideration of the case. On April 16,1957, the Assistant Secretary of the Army directed the Board to further consider the report of the Veterans Administration Appeals Board of March 13, 1957, in which that Board had denied service connection for both the tuberculosis and hearing disabilities, stating that plaintiff’s hearing loss had been the same prior to and after his entry on active duty and that an examination in December 1955 had not shown any significant additional loss of hearing. This report also stated that plaintiff’s hearing loss was not aggravated permanently as the result of drug use nor was aggravation otherwise established.
*272 (b) The Assistant Secretary of the Army also recommended that the Surgeon General’s Office reconsider its findings on plaintiff’s hearing loss, particularly its finding that plaintiff’s loss on entering service was only 10 percent when the plaintiff himself had 'admitted a higher degree of loss, and also the finding on the effect of the drugs on plaintiff’s hearing.
27. On April 23, 1957, the Correction Board resubmitted the case to the Surgeon General’s Office and on May 31,1957, the Surgeon General rendered an opinion which adhered to his former findings on the matter of plaintiff’s hearing loss after entry into service and aggravation of that loss from the use of drugs in the treatment of his tubercular condition.
28. On June 7,1957, the Correction Board reconvened and in its findings the Board summarized the actions taken by the Physical Evaluation Board, the Army Disability Review Board, the Surgeon General’s Office, the Army Physical Review Council, and the Veterans Administration. The Board concluded as follows:
1. That the applicant was continuously hospitalized or under observation from a week after his entrance on active duty until relief from active duty on 4 October 1954 and that during such period no objective finding of active pulmonary tuberculosis was eff ected.
2. That it concurs in the approved findings of the Physical Evaluation Board as supported by the opinion of the Surgeon General’s Office and the several findings of the Veterans Administration that the applicant’s preexisting pulmonary condition was not activated while in service.
3. That it concurs in that part of the approved findings of the Physical Evaluation Board which found that the bilateral hearing loss due to acoustic toxicity from dihydrostreptomycin treatment was not ratable.
4. That it concurs in the opinion expressed by the Army Physical Review Council on 6 June 1957 that the pre-induction audiogram accomplished 14 April 1953 shows a hearing loss rated at 60 per cent; that the audio-gram accomplished 1 September 1954 prior to separation also reflects a hearing loss rated at 60 per cent; that the applicant entered the service with a hearing loss rated 60 per cent; that he was relieved from active duty with a hearing loss rated at 60 per cent and therefore incurred no increase in hearing loss while in the service.
*273 5. That the foregoing findings and opinions that the applicant suffered no ratable disabilities while on active duty are further supported by the action of the Veterans Administration in denying a claim for compensation on 28 December 1954, 8 March 1955, and 8 February 1956, together with the decision of the Board of Veterans Appeals of the Veterans Administration on 13 March 1957, wherein that Board denied an appeal for service connection by aggravation of pulmonary tuberculosis and defective hearing.
6. That the preponderance of compelling medical opinion reflects that the applicant was properly evaluated at the time of his relief from active duty and that such separation by reason of physical disability existing prior to entry on active duty, not aggravated by service, without entitlement to retirement pay benefits was not in error or unjust.
The Board recommended that plaintiff’s application for correction be denied and the Board’s findings, conclusions and recommendations were approved on June 24, 1957, by the Assistant Secretary of the Army.
On September 12, 1960, plaintiff filed this suit.
29. From October 4,1954, when plaintiff was released from active duty, to June 3, 1957, when he finally returned to work, plaintiff was substantially bedridden at home and was cared for by his wife, who was a registered nurse and physical therapist.
PLAINTXFE’s TTJBERCTJLAR CONDITION
30. Considerable evidence was introduced by both parties on the issue of whether or not plaintiff’s tuberculosis was activated during his military service. Expert witnesses for both parties testified with respect to plaintiff’s tubercular condition on the basis of X-rays, sputum and fasting gastric contents, sedimentation rate, tuberculin tests, and chemotherapy.
(a) With respect to the X-ray films taken while plaintiff was on active duty, the majority of films interpreted on an individual film-by-film basis showed inactivity. Periodic reviews, which compared previous X-rays with current films, revealed inactivity with the exception of one hospital report, which was dated September 17, 1953, and covered a review *274 of films for a one-year period only. Subsequent reviews considered longer periods of time. The expert witnesses agreed that the best basis for an accurate interpretation of films to determine activity is a series of films over several years. On the basis of the expert testimony, plaintiff has not established that the X-ray films revealed that his tubercular condition became active or was aggravated during his military service.
(b) The staff at Brooke Army Hospital followed the standards prescribed by the National Tuberculosis Association regarding diagnosis from sputum and gastric contents. Many sputum and gastric contents tests were taken and all results were negative.
(c) The expert witnesses agreed that the sedimentation rate is a non-specific laboratory aid which only indicates that something is wrong with the patient. Many factors can cause sedimentation rate elevation, which may be normal in patients who have active disease and elevated in patients whose disease is inactive. Although plaintiff’s sedimentation rate was persistently elevated during his period of hospitalization in Brooke Army Hospital, the reason for such elevation was never determined.
(d) Plaintiff complained that he was not given a tuberculin test. Inasmuch as such a test only identifies those who have had contact with the organism and does not identify those who have active tuberculosis, versus those who have inactive tuberculosis, there was no reason to give plaintiff such a test.
(e) Plaintiff contends that the extensive use of chemotherapy and the length of time he was hospitalized by the Army indicate that his tubercular condition was believed to be and was, in fact, active. Chemotherapy is used not only to eradicate infection but as a diagnostic tool. Plaintiff’s symptoms on entering the hospital indicated a possibility of reactivation. Lesions were seen on the X-ray and complete reviews could not be then made. Chemotherapy was used to see whether such treatment would cause the lesions to shrink. If the lesions had shrunk, this would have indicated that there was an active infection present and that the disease has improved. After extensive chemotherapy, no change in *275 the lesions was noted. The length of plaintiff’s hospitalization represented an all-out effort by tbe Brooke Army Hospital medical staff to help a fellow physician.
31. Pla.j-nt.iff also asserts that conditions at Brooke Army Hospital aggravated his tubercular condition. When plaintiff became a patient at the hospital, he was first assigned to an observation ward for tuberculosis. Later he was transferred to a positive tuberculosis ward. Baw purulent sputum was allowed to remain on the ward floor near the drinking fountain for several hours each morning and cm the latrine floor for several days at a time. Patients were permitted to cough or sneeze without covering their mouths and noses with tissues. Ward floors were dry-swept, thus disseminating sputum-contaminated dust in which tubercle bacilli can survive for from 8 to 10 days. Ceiling ultra-violet lights were 'kept on at night, making it difficult for patients to sleep, but were turned off when the floors were being swept and beds made, although at such times the lights would have partially sterilized the sputum-laden dust. Bed-rest regulations were not enforced by the staff nor followed by most patients. It was difficult for plaintiff to take advantage of official rest periods because of noise emanating from occupational therapy projects, arguments between patients, radios, record players, and television sets. The patients’ rest was disturbed at night by medical corpsmen who flashed lights in their faces, took pulses, and dumped bed linen for the next day on the beds of sleeping patients. Plaintiff, a doctor himself, who had previously received extensive treatment for active tuberculosis, was understandably disturbed by conditions which he felt were detrimental to the proper treatment of the disease, if present. However, he has not shown by a preponderance of the evidence that conditions at the hospital aggravated his tubercular condition.
32. On the issue of whether or not plaintiff’s tubercular condition was aggravated by his military service, it is established by the evidence:
(a) that prior to plaintiff’s entry on active military duty in 1953, he had enjoyed a period of several years of freedom from active tuberculosis and had been able to earn his living as a doctor working full time in a clinic;
*276 (b) that despite plaintiff’s arrested tubercular condition, it was not until the physical standards were lowered by Army regulation under the Doctors Draft Act of 1950, that plaintiff was judged physically qualified for induction in 1953;
(c) that due to plaintiff’s generally weak constitution and a natural tendency to he concerned about his far from robust health, he represented a borderline case for acceptance under the reduced physical standards of 1953 for doctors who were being considered for induction in the armed services;
(d) that almost immediately after beginning his military training in Texas in the summer of 1953, plaintiff reacted adversely to the physical exertion required of him and to the warm climate, and within a month was hospitalized on suspicion of renewed tubercular activity ;
(e) that although standard and accepted procedures of diagnosis were followed carefully by the medical staff, conditions in the hospital were such that plaintiff was constantly apprehensive about Ms progress and condition.
33. Plaintiff has not shown by the greater weight of the evidence that (a) 'his tuberculosis, which was inactive when he was inducted into the service, was reactivated while he was in military service or that his tubercular condition was aggravated as a result of such military service; or (b) that the administrative determination that he was unfit for military service by reason of inactive tuberculosis which had existed prior to his entry on active duty was arbitrary or capricious.
PLAINTIFF’S HEARING LOSS
34. The preinduction hearing test which was given plaintiff in Pittsburgh on April 14, 1953, was inaccurate and incomplete. It was conducted by an Army sergeant, who stated at the time he knew nothing about the testing machine except what he had read and that plaintiff was the third or fourth person he had tested. The results of the audiogram made at that time showed a profound hearing loss. The inaccuracy of the test was demonstrated by the fact that a series of five hearing tests given plaintiff at the Brooke Army Hospital in the period between April 14, 1953 and January 19, 1954, revealed a marked improvement in plaintiff’s hearing despite the fact that there was no treatment or other intervening *277 circumstances that could have caused such improvement. The tests conducted at the hospital were performed by superior equipment and personnel and were consistent from one date to the next.
The April 14, 1953, test was incomplete because plaintiff did not receive a speech reception threshold test, which measures the ability of a person to understand ordinary conversation as contrasted with his ability to hear a sound as in a pure tone test. At the beginning of the test, plaintiff was instructed as follows:
Don’t signal that you can hear any tone, until it is clear, distinct, and unmistakable, and you can identify the particular tone — not just a sound. I don’t want you to signal as soon as you can hear the slightest sound.
In accordance with these instructions, plaintiff did not signal until after the volume had been increased several steps above his auditory threshold. As a result of this improper procedure, the audiogram reflected that plaintiff had a greater loss in his right or better ear than in his left or poorer ear.
The importance of a threshold hearing test is illustrated by Army Special [Regulations No. 40-530-55 which required that a threshold test be made, and Veterans Administration Regulations (Extension 8) that substituted speech reception tests for tone tests wherever practicable.
While plaintiff’s application for disability compensation was pending in the Veterans Administration, that agency gave plaintiff a threshold speech reception test on November 8, 1954. The extent of his hearing loss at that time was indicated in the report of the examination which stated that “vet couldn’t repeat 50% of spondee words at maximum intensity.”
35. Dihydrostreptomycin frequently has a toxic effect on the hearing nerve. The damage caused by the drug is not immediately noticeable, and the loss of hearing usually occurs at a later date. The resultant hearing damage is permanent and irreversible. The dosage of the dihydro-streptomycin that will produce a hearing loss varies among individuals. In some cases a small dosage of three grams can cause toxic changes and a hearing loss. Plaintiff received a total of 29 grams of this drug at the rate of one *278 gram twice a week, beginning September 19,1953, and. ending January 1,1954-. He first noticed tbe decrease in bis hearing on October 22,1953, when be reported it to tbe medical officer in bis ward at Brooke Army Hospital. He requested that an audiogram be made and that bis medication be changed to streptomycin to prevent a further increase in deafness. He was given a pure tone audiogram on October 28, 1953, at tbe hospital but no decrease in bearing was noted. These symptoms are consistent with the delayed effects of the use of dihydrostreptomycin. Beginning on January 1, 1954, he was permitted to buy streptomycin at his own expense and this drug was administered to him in lieu of the dihydro-streptomycin. In the period from June 2, 1954 to September 1, 1954, four additional hearing tests were given at the Brooke Army Hospital and each of these showed that a marked increase in his hearing loss had occurred since the five hearing tests given to him at the same hospital in the period between October 28,1953 and January 19,1954. The greater weight of the evidence shows that this increase in hearing loss was attributable to the use of dihydrostrepto-mycin for treating plaintiff, since there were no other circumstances that could have accounted for the change in his hearing ability.
36. Although the Veterans Administration stated (finding 23) that the dosage of dihydrostreptomycin administered to plaintiff was not sufficient to cause auditory damage, that opinion was contrary to the conclusion of the 'Surgeon General (finding 25) and is also contrary to undisputed expert medical evidence adduced at the trial.
In 1950 a group of Army, Navy, and Veterans Administration hospitals, that had been selected for a cooperative study of the toxicity of dihydrostreptomycin and its effect on the hearing nerve, discontinued the use of the drug.
37. After his discharge from the service, plaintiff was given two more hearing tests, one on September 9, 1961, and one on January 27,1962. Ihe results of these tests were approximately the same as the tests given at Brooke Army Hospital in the period between June 2, 1954 and September 1, 1954, and demonstrate that plaintiff’s hearing loss is permanent and irreversible.
*279 38. The finding by tbe Veterans Administration that plaintiff’s bearing loss was not service-incurred and the opinion expressed by the Army Physical Review Council on June 6, 1957, that plaintiff suffered no increase in hearing loss while he was in service, were erroneous in that these conclusions were arrived at by comparing the extent of plaintiff’s hearing loss at the time of his discharge, with the hearing loss shown by the inaccurate test conducted at Pittsburgh, Pennsylvania, on April 14,1953.
39. The Army Board for the Correction of Military Records, which declined to follow the Surgeon General’s opinion and which relied on the opinion of the Army Physical Review Council and the findings of the Veterans Administration, erroneously concluded that plaintiff incurred no hearing loss while in military service, because the board’s conclusion was based largely on a comparison of plaintiff’s hearing loss as reported in the inaccurate audiogram of April 14,1953, with the hearing loss shown by the audiogram taken at Brooke Army Hospital on September 1,1954.
40. (a) The best measure of plaintiff’s hearing loss as of the date he entered on active duty is supplied by the hearing tests given at Brooke Army Hospital between October 28, 1953 and January 19, 1954. Pursuant to the Veterans Administration Schedule for Rating Disabilities, plaintiff’s hearing impairment at the time warranted a disability rating of 10 percent.
(b) Plaintiff’s hearing loss, after the full impact of the dihydrostreptomycin syndrome was known, was correctly measured by the hearing tests given at Brooke Army Hospital between June 2, 1954 and September 1, 1954. Under the Veterans Administration Schedule for Rating Disabilities, the disability amounted to 100 percent.
(c) Plaintiff’s hearing loss in his better ear averaged substantially above 60 decibels in the series of four tests given at Brooke Army Hospital between June 2, 1954 and September 1, 1954. By reason of provisions of paragraph 7 (a)4, Army Special Regulations No. 40-530-55,[1] he was *280 unfit for duty, and the Surgeon General so stated in his opinion of August 80,1956.
41. It has been shown by a preponderance of the evidence that:
(a) Plaintiff began active military service with a hearing disability rateable at 10 percent;
(b) he was released from, active military service with a hearing disability rateable at 100 percent;
(c) his 'increased hearing loss was service aggravated and such increased loss is rateable at 90 percent, and
(d) since the administrative action, which denied disability retirement pay to plaintiff for 'his increased hearing loss, was based largely on an erroneous military record, the administrative action was arbitrary.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover disability retirement pay as to his claim for increased hearing loss and judgment as to this claim is entered for plaintiff with the amount of recovery to be determined pursuant to Buie 38 (c). It is further so concluded that plaintiff is not entitled to recover on his claim relating to his tubercular condition and as to this claim his petition is dismissed.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on June 5, 1964, that judgment for the plaintiff be entered for $30,435.64.

 This regulation provided in pertinent part as follows:
4 — Cases of true deafness involving a hearing loss in the better ear of 60 decibels or more in the speech range, such patients should be considered medically unfit, processed for disability separation and transferred to the Veterans Administration for further treatment and auditory rehabilitation.